United States District Court
Southern District of Texas
ENTERED
September 17, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **REBECCA MUSGRAVE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:23-CV-04168** |
| | § | |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |
| | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a personal injury lawsuit stemming from a motor vehicle accident that occurred when Plaintiff Rebecca Musgrave collided with a United States Postal Service ("USPS") truck that was turning left into oncoming traffic. Ms. Musgrave sued the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680. She alleges that the crash was caused by the negligence of the driver of the truck, USPS employee Jerry Casey, and that she was seriously injured as a result. The United States argues that Ms. Musgrave was at least 51% responsible for the crash, barring her from recovery under Texas law. It further argues that, even if Ms. Musgrave is permitted to recover, her damages should be limited because many of her ailments are attributable to her preexisting medical conditions rather than the car crash.

The Court held a three-day bench trial beginning on May 11, 2026. It then provided time for both parties to submit additional post-trial briefing, which the Court has now received. The following findings of fact and conclusions of law are based upon the evidence presented at trial, including the Court's observation of witnesses and their relative credibility; the parties' arguments

and post-trial briefing; and the applicable authorities. Having considered the entire record, the Court now rules against the United States and in favor of Plaintiff on her claim of negligence under the FTCA. However, the Court also concludes that Ms. Musgrave bears some responsibility for the crash and reduces her recovery accordingly.

## I. FINDINGS OF FACT

### A. Background

1. Plaintiff Rebecca Musgrave is a resident of Houston. Trial Transcript Vol. 2 (ECF No. 52) at 52. Ms. Musgrave was born on April 28, 1956, making her sixty-five years old at the time of the accident and seventy years old at the time of the trial. *Id*. at 51. Prior to 2007, she was an elementary school and special education teacher. *Id*. at 52-53. She retired in 2007 and was not working at the time of the accident. *Id*.

2. Defendant United States of America is sued under the Federal Tort Claims Act because Ms. Musgrave alleges that her claims arise out of the actions or omissions of Jerry Wayne Casey, an employee of USPS. ECF No. 1 (Complaint).

3. Mr. Casey is employed as a truck driver for USPS. Trial Transcript Vol. 2 at 132. It is undisputed that Mr. Casey was acting within the scope of his employment for USPS at the time of the accident. *See id*. at 132-33.

### B. The Accident

4. At approximately 1:00 pm. on March 2, 2022, Ms. Musgrave was driving her adult son, who is severely disabled, to a psychiatrist's appointment.[1] Trial Transcript Vol. 2 at 54-55. The

[1] Although Ms. Musgrave's son witnessed the accident, he was unable to testify at trial or otherwise provide evidence because he is not considered mentally competent. Trial Transcript Vol. 2 at 55. Ms. Musgrave testified that her son suffers from severe and profound intellectual disability (also known as mental retardation), bipolar disorder, and Graves' disease, among other conditions. *Id*. at 54.

officer of her son's doctor was located on Red Oak Drive in Houston, Texas, directly next to the Westfield Post Office. *Id*. at 55. Ms. Musgrave was driving her 2016 Toyota Highlander. *Id*. at 57.

5. Red Oak Drive has two lanes of traffic in each direction. *Id*. at 135.

6. Ms. Musgrave recalls stopping at a four-way stop at the intersection of Peakwood Drive and Red Oak Drive and turning left onto Red Oak Drive. *Id*. at 57-58. She was then driving south on Red Oak Drive towards the doctor's office and post office. *Id*. Ms. Musgrave, who was knocked unconscious and sustained a traumatic brain injury as a result of the accident, has no further memory of the events leading up to the moment of impact. *Id*. at 59.

7. Peakwood Drive is approximately 670 feet north of where the accident occurred. Trial Transcript Vol. 1 (ECF No. 51) at 44.

8. Ms. Musgrave estimates that she was in the lefthand lane moving to the right when the crash occurred. Trial Transcript Vol. 2 at 59.

9. While Ms. Musgrave was driving her son to his appointment, Mr. Casey was returning to the Westfield Post Office in a USPS semi-truck. *Id*. at 134.

10. To reach the post office, Mr. Casey had to drive north on Red Oak Drive and then make a left turn into the post office's private driveway. *Id*. There is no traffic signal or lefthand turn lane on the relevant portion of Red Oak Drive. *Id*. at 136-37.

11. Mr. Casey was aware that oncoming traffic in the southbound lanes of Red Oak Drive had the right of way. *Id*. at 137.

12. Mr. Casey typically has a good view of the southbound lanes of Red Oak Drive when turning into the post office and can usually see as far as Peakwood Drive, where Ms. Musgrave turned onto Red Oak. *Id*. at 139. However, on the day of the accident, Mr. Casey's view was

obstructed by a large white F-250 truck that was stopped approximately ten feet in front of him in the lefthand lane. *Id*. at 140-41. The truck was "lifted" and had wide tires and large shocks. *Id*.

13. Mr. Casey came to a complete stop in the lefthand lane to check for oncoming traffic. *Id*. at 136. He waited for approximately one-and-a-half minutes prior to turning in an attempt to see what the white truck was going to do. *Id*. 162-63. However, the white truck did not move. *Id*.

14. Mr. Casey could see "slightly beyond" the white truck into oncoming traffic. *Id*. at 142. He did not see any cars coming south on Red Oak beyond the white truck and decided it was safe to turn. *Id*. He did not see Ms. Musgrave's vehicle coming towards him until after he had begun his lefthand turn; had he seen her, he would not have started the turn. *Id*.

15. As soon as Mr. Casey made the turn into the southbound lane of traffic, he saw Ms. Musgrave's vehicle coming towards him. *Id*. at 163. Mr. Casey slammed on his brakes. *Id*. at 164. Ms. Musgrave's vehicle then crashed into the passenger side of Mr. Casey's USPS truck. *Id*. at 142.

16. At trial, Mr. Casey agreed that it would be dangerous to make a lefthand turn while an obstruction was blocking his view of oncoming traffic. *Id*. at 139-40. He also acknowledged that in hindsight, he believed that the reason he did not see Ms. Musgrave before starting his lefthand turn was because her vehicle was obstructed by the white truck. *Id*. at 145. Mr. Casey further agreed that he bears at least partial responsibility for the accident because he failed to yield the right of way to Ms. Musgrave. *Id*. at 146.

17. The undisputed evidence establishes that Mr. Casey's view of oncoming traffic was obstructed by the large white truck in front of him and that the presence of the truck was a but-for cause of the collision.

18. The parties dispute the speed at which Ms. Musgrave was travelling as well as whether she applied her brakes or otherwise attempted to avoid the accident.

19. The speed limit on the relevant portion of Red Oak Drive was 35 miles per hour. Plaintiff's Ex. 1 (Police Report)[2].

20. Ms. Musgrave believes that she was not going more than 20 miles per hour at the time of the accident. Trial Transcript Vol. 2 at 58. She cannot recall whether she applied her brakes. *Id*. at 117.

21. The Plaintiff's accident reconstruction expert, Dan Beeler, estimated that Ms. Musgrave was going 22 to 23 miles per hour at the time of impact. Trial Transcript Vol. 1 at 36. This estimate was based on photographs of the scene of the crash, the extent of damage to the vehicle, crash-testing data from a similar vehicle to Ms. Musgrave's, and commonly used accident-reconstruction software known as HVE. *Id*. at 26-33.

22. Mr. Beeler also opined that had Ms. Musgrave applied her brakes, there would not necessarily be skid marks on the road from her vehicle because the vehicle was equipped with an antilock braking system, which makes skid marks less likely. *Id*. at 36.

23. Mr. Beeler further testified that, based on his analysis, Ms. Musgrave was approximately 245 feet away when Mr. Casey began his left turn. *Id*. at 52.

24. By contrast, Mr. Casey expressed a belief that Ms. Musgrave was speeding and that she did not appear to brake before the accident. *Id*. at 146; 163-64. This belief was based in part on his observation of Ms. Musgrave's vehicle as it approached him and in part on the damage to his truck, which he believed would only be possible if Ms. Musgrave had been travelling at a high rate of

---

[2] Defendant objected to the narrative portion of the police report as hearsay. *See* Trial Transcript Vol. 1 at 29. The Court overrules this objection. The full report, including any factual findings, is admissible as a public record under Federal Rule of Evidence 803(8).

speed. *Id*. at 146-47. However, Mr. Casey also acknowledged that the accident happened very quickly, meaning that he could not accurately estimate Ms. Musgrave's speed, and that he is not an expert in assessing speed based on damage to his truck. *Id*.

25. Bernard Austin, a logistics manager for USPS and Mr. Casey's supervisor, also expressed a belief that Ms. Musgrave was driving above the speed limit. *Id*. at 172; 190. As part of his role, Mr. Austin is called in to investigate when a USPS driver is involved in an accident. *Id*. at 174. In this case, he interviewed Mr. Casey, took photographs of the damage, and submitted a report to USPS' torts claims division. *Id*. at 177; 195. He did not personally witness the accident.

26. Mr. Austin testified that Ms. Musgrave's bumper was "wedged in" to the truck's passenger side steel tire, that the steel tire was pushed into the truck's wheel well, and that the USPS truck's number two shackle, which connects the lead spring and the axel, was knocked off during the crash. *Id*. at 177-90. Mr. Austin described this as "alarming" and expressed a belief that it would take a "serious impact" to move the shackle, leading him to believe that Ms. Musgrave was travelling above 35 miles per hour at the moment of impact. *Id*. Mr. Austin also testified that he has observed numerous accident scenes involving USPS vehicles and that he had seen accidents involving lower speeds where less damage was done. *Id*. at 192. However, Mr. Austin was not offered as an expert witness, does not have expertise in determining speed from vehicle damage, and did not conduct any testing or other analysis. *Id*. Mr. Austin also acknowledged that the angle of impact, not only the vehicle speed, affects the damage to the vehicles. *Id*.

27. Determining after the fact the speed at which a vehicle was travelling prior to a crash is a difficult and inherently speculative endeavor. Nonetheless, the preponderance of the evidence suggests that Ms. Musgrave was travelling approximately 22 to 23 miles per hour at the time of impact. In light of Mr. Beeler's qualifications and methods, the Court finds his estimation of Ms.

Musgrave's speed more credible than those of Mr. Casey or Mr. Austin. Given the numerous factors that impact the amount of vehicular damage caused by a crash, the Court is not persuaded that Mr. Casey or Mr. Austin are qualified to judge Ms. Musgrave's speed from the damage to Mr. Casey's truck. The Court also gives some weight to Ms. Musgrave's estimation of her own speed based on her habit and experience. The Court does not credit Mr. Casey's estimation of Ms. Musgrave's speed from his observation of her directly prior to the crash, given the difficulty of perceiving the speed of an oncoming vehicle in the seconds before a collision.

28. The parties also dispute whether Ms. Musgrave was wearing a seatbelt at the time of the accident. Ms. Musgrave testified that she was wearing her seatbelt. *Id*. at 58. The police report similarly describes Ms. Musgrave as wearing a seatbelt. Plaintiff's Ex. 1 (Police Report). However, the emergency medical provider's report describes Ms. Musgrave as an "unrestrained driver." Defendant's Ex. 2 (HCA Houston Healthcare Northwest Records).

29. The Court credits Ms. Musgrave's testimony and the police report and concludes that it is more likely than not that Ms. Musgrave was wearing her seatbelt at the time of the crash. The contrary medical record was written after Ms. Musgrave had been transported to the emergency room by individuals who were not present at the scene of the accident and is therefore unreliable on the question of whether Ms. Musgrave was wearing a seatbelt.

### C. Ms. Musgrave's Injuries and Preexisting Medical Conditions

30. Ms. Musgrave suffered from numerous preexisting conditions prior to the accident. Those that are relevant to the present analysis are as follows: hypertension; obesity; diabetes; high blood pressure; arthritis; lower back pain; obstructive sleep apnea; migraine headaches; depression; anxiety; neuropathy; small vessel ischemic disease. *See* Trial Transcript Vol. 2, 42-44; 101-02; 105; 110-11.

31. Ms. Musgrave underwent a total knee replacement in her left knee prior to 2007. *Id*. at 84-85. She underwent a total knee replacement in her right knee approximately four to five years prior to the accident. *Id*.

32. As a result of the crash, Ms. Musgrave sustained the following injuries:

a. A subdural hematoma and mild-complicated or moderate traumatic brain injury. Trial Transcript Vol. 1 at 84-85.

b. A comminuted (i.e., shattered) tibia fracture to the right leg. *Id*. at 88-89.

c. Fifth and second metacarpal fractures to the left hand. *Id*. at 89-90.

d. A rib fracture. *Id*. at 90.

e. A cervical spine ligamentous injury. *Id*. at 90-91.

33. Ms. Musgrave spent nine and a half days in the hospital immediately after the accident followed by fifteen and a half days in a rehabilitation center. Trial Transcript Vol. 2 at 59.

34. Her first conscious memory after the accident is of waking up in the rehabilitation center in extreme pain and beginning to cry and scream. *Id*. at 59-60. Ms. Musgrave's head "felt like it was about to burst," her body hurt, and her leg was in "immense pain." *Id*.

35. On March 8, 2022, Ms. Musgrave underwent right knee arthroplasty with revision of the tibia component, open reduction internal fixation of the right medial/posteromedial tibia plateau fracture, and open reduction internal fixation of the right tibia tubercle fracture. Trial Transcript Vol. 1 at 89. In other words, Ms. Musgrave underwent surgery to repair her fractured tibia as well as a second right knee replacement surgery.

36. The wound from this surgery did not initially heal properly, which required doctors to debride and re-stitch the wound. Trial Transcript Vol. 2 at 61-62. For several months, Ms.

Musgrave was unable to walk and used a wheelchair. *Id*. at 63. She then transitioned to a walking cast and crutches, and eventually a walker. *Id*.

37. Ms. Musgrave continues to experience pain in her right leg at the site of the surgery. Trial Transcript Vol. 2 at 66-67. She did not previously experience knee pain. *Id*.

38. Ms. Musgrave initially experienced pain from the fractures to her fingers, but this pain is now fully resolved after receiving treatment. *Id*.

39. Dr. William Granberry, an orthopedic surgeon, reviewed Ms. Musgrave's medical records and offered expert testimony regarding her orthopedic injuries. Trial Transcript Vol. 3 at 5-6. He testified that all the orthopedic care provided to Ms. Musgrave after the accident was appropriate and was appropriately performed. *Id*. at 6. Dr. Granberry also opined that Ms. Musgrave's prior knee replacement made her right knee more prone to injury and more difficult to repair. *Id*. at 7. The Court credits this testimony.

40. The Court further credits Dr. Granberry's testimony that Ms. Musgrave's preexisting conditions, particularly obesity and chronic pain, likely made it more difficult for her to recover from her orthopedic injuries. *Id*. at 13-14.

41. The Court finds that Ms. Musgrave's knee injuries and subsequent surgery and related pain were direct results of the accident.

42. The Court also finds that Ms. Musgrave's finger and rib fractures and the pain and treatment associated with them were directly attributable to the accident.

43. Ms. Musgrave previously underwent radio frequency ablation for lower back pain in 2018 and 2019, which was successful in treating her back pain from 2019 until the accident in March of 2022. Trial Transcript Vol. 2 at 68-69. After the accident, Ms. Musgrave's back pain worsened,

and she underwent additional radio frequency ablation treatments. *Id*. This treatment resolved some but not all of the pain. *Id*. 70.

44. The Court finds that the accident exacerbated Ms. Musgrave's preexisting back pain.

45. It is undisputed that Ms. Musgrave suffered a traumatic brain injury as a result of the accident. *See* Trial Transcript Vol. 1 at 145 (Dr. Lewine testimony); Trial Transcript Vol. 3 at 53 (Dr. Sellin testimony).

46. Prior to the accident, Ms. Musgrave experienced migraine headaches once or twice per month. Trial Transcript Vol. 2 at 74-75. After the accident, Ms. Musgrave experienced migraines nearly every day. *Id*. at 75. The duration and intensity of the migraines also increased. *Id*. Ms. Musgrave now receives 20 Botox injections directly into her head from a neurologist every three months to treat her migraine headaches. *Id*. at 77. While these injections are successful in treating Ms. Musgrave's migraines, they are also painful. *Id*.

47. Dr. Richard Fulbright, a neuropsychologist, testified that post-traumatic headaches are a common after-effect of brain injuries, and that these headaches are more likely to occur in people who, like Ms. Musgrave, have a preexisting history of headaches. *Id*. at 26-27. Dr. Jonathan Sellin, a neurosurgeon, testified that while most people with similar traumatic brain injuries make a full recovery, these injuries can cause long-term headaches. Trial Transcript Vol. 3 at 47-48.

48. Ms. Musgrave also reports other decreases in her quality of life related to the traumatic brain injury she sustained during the crash. Specifically, she testified that she experiences dizziness, balance problems, short-term memory loss, irritability, and difficulty concentrating. Trial Transcript Vol. 2 at 71-72; 90.

49. Dr. Jeffery David Lewine, a neuroscientist, reviewed Ms. Musgrave's medical records and performed brain imaging tests in May of 2023, including volumetrics imaging and diffusion tensor

imaging (DTI). Trial Transcript Vol. 1 at 144-45; 188. Volumetrics measures the brain's gray matter, while DTI measures white matter. *Id*. at 170. This imaging showed that Ms. Musgrave's gray matter volumes are in the bottom first percentile for female subjects in her age group, which is abnormal. *Id*. at 169. The global volume of her brain was likewise in the bottom first percentile, which was mostly attributable to size abnormalities in her left frontal lobe and left temporal lobe. *Id*. DTI testing revealed that Ms. Musgrave has experienced a loss of connective fibers in her frontal lobes, which can impact attention, language, executive skills, and processing speed. *Id*. at 172. Dr. Lewine opined that while some of these deficits were attributable to Ms. Musgrave's premorbid conditions, the majority were caused by the 2022 traumatic brain injury. *Id*. at 145. Specifically, Dr. Lewine acknowledged that small vessel ischemic disease, hypertension, diabetes, sleep apnea, cardiac problems, autoimmune conditions, and migraines can all cause changes to the brain, but opined that the changes caused by the combination of these conditions were inadequate to explain the extent of the abnormalities in Ms. Musgrave's brain absent the traumatic brain injury. *Id*. at 173-74.

50. Ms. Musgrave did not undergo brain imaging or cognitive testing prior to the accident, so it was not possible to compare her results from before and after the traumatic brain injury. *Id*. at 181. However, she did undergo a CT scan immediately after the accident. *Id*. at 176. Dr. Lewine's analysis showed that Ms. Musgrave lost nine percent of her brain volume in the year following the accident. *Id*. at 177-78. Dr. Lewine opined that absent a traumatic event, he would expect to see a maximum of a three percent decrease in volume in a female of Ms. Musgrave's age with small vessel ischemic disease. *Id*. at 178.

51. Dr. Fulbright, the neuropsychologist, performed cognitive testing on Ms. Musgrave, conducted a clinical interview with Ms. Musgrave, and conducted a collateral interview with

Deborah Moore, a friend of Ms. Musgrave. Trial Transcript Vol. 2 at 10-11. Dr. Fulbright's evaluation revealed that although Ms. Musgrave's IQ is within the normal range, she suffers cognitive deficits in executive functioning, including deficits in language, memory, and attention. *Id*. at 11-21. These deficiencies are consistent with the imaging performed by Dr. Lewine. *Id*. at 13-14; Trial Transcript Vol. 1 at 169-70.

52. Neurosurgeon Dr. Jonathan Sellin, reviewed Ms. Musgrave's medical records, life care plan, and neuropsychological evaluations. Trial Transcript Vol. 3 at 31-33. Dr. Sellin testified that Ms. Musgrave sustained a traumatic brain injury during the crash that he classified as somewhere between mild and moderate. *Id*. at 46-47; 53. He further opined that while most people fully recover from brain injuries of this type, significant long-term impacts are possible. *Id*. at 47. In Ms. Musgrave's case, Dr. Sellin testified that Ms. Musgrave's preexisting sleep apnea, depression, and small vessel ischemic disease can cause cognitive symptoms such as headaches, poor concentration, irritability, and memory problems. *Id*. at 44-46. Dr. Sellin opined that Ms. Musgrave's reported cognitive symptoms resulted from multiple factors, including both the traumatic brain injury and her preexisting conditions. *Id*. at 56. Dr. Sellin did not critique Dr. Lewine's report. *Id*. at 64.

53. The Court finds that Ms. Musgrave more likely than not experienced significant negative long-term impacts from her March 2022 traumatic brain injury. Specifically, the Court finds that the symptoms described by Ms. Musgrave and Dr. Fulbright, including more frequent and more intense migraines, cognitive difficulties, and balance issues, were primarily caused by the car accident rather than Ms. Musgrave's preexisting conditions. The Court credits Dr. Lewine's unrebutted testimony that while Ms. Musgrave's preexisting conditions likely explained some of

the decrease in her brain volume between 2022 and 2023, the majority of this decrease is attributable to the traumatic brain injury.

54. The Court also finds that Ms. Musgrave is likely to continue experiencing these symptoms for the foreseeable future. *See id.* at 55 (Dr. Sellin testifying that cognitive deficits resulting from a traumatic brain injury that persist twelve months after the injury are unlikely to improve).

55. As Defendant points out, Ms. Musgrave has been involved in additional car accidents both prior to and since the accident at issue in this case. *See* Trial Transcript Vol. 2 at 108; 110; 121-23. However, the Court finds no evidence to suggest that these accidents, rather than the March 2022 accident, caused or exacerbated Ms. Musgrave's cognitive deficits or other symptoms. It is uncontested that this accident resulted in a traumatic brain injury, multiple surgeries, and over a week of hospitalization. By contrast, she did not require medical care for any of her previous car accidents. Trial Transcript Vol. 2 at 128.

56. Since the accident, Ms. Musgrave has also begun experiencing urinary incontinence. *Id*. at 73. Ms. Musgrave previously experienced some urinary incontinence issues prior to 2003 after undergoing a hysterectomy. *Id*. at 74. In 2003, she had a bladder sling installed. *Id*. Ms. Musgrave had no urinary incontinence issues from the installation of the bladder sling in 2003 until the instant accident in 2022. *Id*.

57. Dr. David Altman, a neurologist and life care planner, opined that Ms. Musgrave suffered from post-traumatic urinary incontinence as a result of the 2022 accident. Trial Transcript Vol. 1 at 75; 103.

58. The Court finds that the renewal of Ms. Musgrave's urinary incontinence is more likely than not attributable to the accident.

### D. Ms. Musgrave's Past Medical Expenses

59. Ms. Musgrave's total paid and incurred medical expenses as a result of the accident were $80,116.47. Trial Transcript Vol. 1 at 81-84 (Dr. Altman's testimony) [3]; Plaintiff's Exs. 13-22.

60. Based on Dr. Altman's testimony and Ms. Musgrave's billing records, the Court finds that these medical expenses were reasonable and necessary. [4]

61. At the time of the accident, Ms. Musgrave was primarily insured by Medicare. Trial Transcript Vol. 2 at 93. She also received insurance through ChampVA, a federal insurance

---

[3] At trial, Defendant objected to Dr. Altman's testimony on this subject on the basis that it was beyond the scope of his expert report. *See* Trial Transcript Vol. 1 at 82. Defendant raised the same objection to Dr. Altman's affidavit regarding the costs of medical treatment in its motion to strike at the summary judgment stage. *See* ECF No. 34. The Court previously denied Defendant's motion to strike, and overruled Defendant's objection to the testimony at trial. *See* Minute Entry of November 24, 2025; Trial Transcript Vol. 1 at 83-84. While the Court agrees with Defendant that Dr. Altman's affidavit regarding medical expenses should have been disclosed earlier, the Court concluded at the summary judgment stage that this error was "substantially justified or harmless." FED. R. CIV. PRO. 37(c). In making this determination, Courts in the Fifth Circuit consider "(1) the importance of the witness's testimony; (2) the prejudice to the opposing party if the witness is allowed to testify; (3) the possibility that a continuance would cure potential prejudice; and (4) the explanation given for the failure to identify the witness. *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1000 (5th Cir. 1998). Here, the Court found that the first, second, and third *Campbell* factors favored allowing Dr. Altman's testimony. Moreover, any potential prejudice to Defendant was cured by the more than six-month interval between production of the affidavit and the trial in this case.

[4] At trial, the Court also overruled Defendant's objection to Ms. Musgrave's billing affidavits. See Trial Transcript Vol. 1 at 84. Ms. Musgrave submitted these affidavits from her medical providers pursuant to the procedure laid out in Texas Civil Practice and Remedies Code § 18.001(b). Defendant argues that these affidavits are not admissible in federal court to prove reasonableness and necessity unless they are accompanied by expert testimony from each treating medical provider. The Court disagrees. The Court considers Dr. Altman's expert testimony sufficient to overcome this objection. To the extent that Dr. Altman's opinion is insufficient, the Court also agrees with other federal courts in Texas which have determined that section 18.001 affidavits are admissible in FTCA cases because they are substantive under the *Erie* doctrine. *See, e.g., Peals v. QuikTrip Corp.*, 2021 WL 302547, at *5 (E.D. Tex. Jan. 6, 2021) (finding that § 18.001 is so intertwined with the state-law framework for determining damages that it is substantive under *Erie*); *Butler v. United States*, No. 3:15-CV-2969-M, 2017 WL 11696361, at *2 (N.D. Tex. June 2, 2017) (same).

program for veterans and their families. *Id*. Additionally, Ms. Musgrave had a supplemental insurance policy through Aetna. *Id*.

62. Aetna paid a total of $73,723.74 in medical expenses related to the accident. *Id*. at 94-95; Trial Transcript Vol. 1 at 113.

63. Ms. Musgrave paid a total of $40 for her healthcare from the injuries suffered in the crash and still owes $5,765.30. Trial Transcript Vol. 1 at 113.

64. Ms. Musgrave is seeking to recover past medical expenses in the amount of $79,529.04, which is the total of the amount paid by Aetna and the sums that Ms. Musgrave either paid or still owes. None of this amount was paid for by Medicare.

**E. Ms. Musgrave's Quality of Life and Future Medical Expenses**

65. Despite her preexisting conditions, prior to the accident Ms. Musgrave was able to walk unassisted, was the primary caretaker for her mentally disabled adult son, cooked and cleaned her home without assistance, read multiple books per week, and enjoyed painting. Trial Transcript Vol. 2 at 87-90.

66. As a result of the injuries she sustained from the accident, Ms. Musgrave's quality of life has significantly decreased. Ms. Musgrave now relies on a walker when she is outside of the house because of her balance problems and leg pain. *Id*. at 63. She paints infrequently because of difficulty concentrating and has mostly stopped reading physical books because reading triggers her migraines. *Id*. at 90-91. She has hired a housecleaner who comes once per week because she is no longer able to do heavy cleaning. *Id*. at 92. Her son now resides in a group home facility, although the Court concludes that this placement was not directly attributable to Ms. Musgrave's injuries from the accident. *Id*. at 91-92. As discussed in the previous section, Ms. Musgrave's

quality of life has also been impacted by increased back pain, the long-term impacts of her traumatic brain injury, and her renewed urinary incontinence.

67. Plaintiff's expert life-care planner, Dr. Altman, testified that Ms. Musgrave's residual life expectancy was approximately eighteen years as of 2024. Trial Transcript Vol. 1 at 94. The Court finds this estimate to be reasonable.

68. Dr. Altman estimated that Ms. Musgrave's future medical expenses, including outpatient care, therapeutic services, medication, diagnostic testing, equipment, and supplies would amount to $319,241.13 in current dollars. *Id.* at 96-107; Plaintiff's Ex. 42. Dr. Altman factored Ms. Musgrave's preexisting conditions into this estimate, as well as the fact that Ms. Musgrave would have likely required some of the recommended services within three to five years even absent the accident. *See, e.g., id.* at 98 (apportioning zero dollars for treatment of lower back pain because Ms. Musgrave would have required this treatment absent the accident); *id.* at 97 (same with regard to future costs associated with Ms. Musgrave's knee surgery); *id.* at 99-100 (capping costs for household help at three to five years because Ms. Musgrave likely would have required these services after that point even absent the accident).

69. Dr. Granberry opined that Ms. Musgrave would not require any future orthopedic treatment for her knee, finger, or rib injuries related to this accident. Trial Transcript Vol. 3 at 14. The Court credits this testimony. However, Dr. Altman did not allocate any future care costs for orthopedic treatment of these injuries in his life care plan, and Dr. Granberry did not opine on whether Ms. Musgrave's current use of a walker is related to her knee injury. There is therefore no conflict between these two expert opinions.

70. The Court finds Dr. Altman's life care plan and cost estimate to be reasonable in all respects.[5]

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

This Court has jurisdiction over this matter and the parties because Plaintiff asserts claims against the United States for personal injuries caused by the negligent or wrongful act or omission of any Government employee. 28 U.S.C. § 1346(b)(1). Venue is proper in this cause because the events giving rise to the claims occurred in the Southern District of Texas. 28 U.S.C. § 1402(b).

### B. Legal Standard

#### 1. The Federal Tort Claims Act

The Federal Tort Claims Act (FTCA) provides a limited waiver of sovereign immunity, authorizing plaintiffs to bring civil tort lawsuits against the United States if the claim is (1) against the United States; (2) for money damages; (3) for injury to or loss of property, or personal injury or death; (4) caused by a federal employee's negligent or wrongful act or omission; (5) while acting within the scope of his or her office or employment; and (6) under circumstances where the United States, if a private person, would be liable to the plaintiff in accordance with the law of the place where the act or omission occurred. 8 U.S.C. § 1346(b). Where the FTCA applies, the United

[5] The only seriously disputed aspect of Dr. Altman's recommendation is the appropriateness of two medications which Dr. Altman opined would be appropriate to treat the symptoms associated with Ms. Musgrave's traumatic brain injury. Dr Sellin opined that these medications, a cholinesterase inhibitor and an NMDA antagonist, were not appropriate or well-validated treatments for an injury such as Ms. Musgrave's. Trial Transcript Vol. 3 at 49-50. However, Dr. Sellin is a neurosurgeon rather than a neurologist, and he does not have experience providing long-term care for patients with traumatic brain injuries. *Id*. at 63. The Court credits Dr. Altman's testimony regarding these medications, which was detailed and informed by his expertise as a neurologist. Trial Transcript Vol. 1 at 103105.

States is liable for certain torts "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

Here, it is undisputed that Plaintiff's claims fall under the FTCA. It is also undisputed that Mr. Casey was acting in the course and scope of his employment as an employee of the United States Postal Service at the time of the accident.

**2. Negligence**

"To maintain a negligence claim under Texas law, a plaintiff must show 'the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach.'" *Kristensen v. United States*, 993 F.3d 363, 368 (5th Cir. 2021) (quoting *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)); *see also Rodriguez-Escobar v. Goss,* 392 S.W.3d 109, 113 (Tex. 2013).

Duty is defined as the obligation to conform to a particular standard of conduct toward another and is the threshold inquiry in a negligence cause of action. *C.J. Doe v. Boys Clubs of Greater Dallas, Inc.,* 868 S.W.2d 942, 948 (Tex. App.—Amarillo 1994), *aff'd* 907 S.W.2d 472 (Tex. 1995). A breach of duty generally occurs when a person fails to act as a reasonable person would have acted under the same or similar circumstances or engages in conduct that a reasonable person would not have under the same or similar circumstances. *See 20801, Inc. v. Parker,* 249 S.W.3d 392, 398 (Tex. 2008).

"[P]roximate cause[] may be broken down into two components: (1) cause in fact and (2) foreseeability." *Medina v. United States*, No. 4:21-CV-00092, 2025 WL 968231, at *6 (S.D. Tex. Apr. 1, 2025). "Foreseeability requires that the injury complained of be of such a general character as might reasonably have been anticipated from the defendant's conduct." *Kristensen v. United States,* 993 F.3d 363, 368 (5th Cir. 2021).

Texas follows a modified comparative negligence rule. Specifically, Texas law directs the factfinder to "determine the percentage of responsibility, stated in whole numbers," for (as relevant here) the plaintiff(s) and defendant(s) who caus[ed] or contribut[ed] to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard." Tex. Civ. Prac. & Rem. Code Ann. § 33.003. Should a negligent act or omission by the plaintiff be found partially responsible for the harm at issue, her damages must be reduced in proportion with her responsibility. Should the plaintiff's percentage of responsibility be greater than 50%, she is barred from any recovery under Texas law. Tex. Civ. Prac. & Rem. Code Ann. § 33.001.

In determining comparative fault, there must be a preliminary finding that the plaintiff was in fact contributorily negligent. *See Kroger Co. v. Keng*, 23 S.W.3d 347, 351 (Tex. 2000). "Contributory negligence contemplates an injured person's failure to use ordinary care in regard to his or her own safety," and requires proof that the plaintiff was negligent and that the negligence was the proximate cause of the plaintiff's injuries. *Id.*; *see also Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 520 (Tex. 1978). Contributory negligence is an affirmative defense, and the burden of proof therefore rests with Defendant. *Keng*, 23 S.W.3d at 351.

**C. Defendant's Negligence**

The evidence in this case clearly establishes Mr. Casey's negligence. Mr. Casey had a duty to exercise reasonable care in the operation of the USPS truck, including observing traffic laws, keeping a proper lookout, avoiding other vehicles operating on the roadways, and driving with due regard for the safety of others. *See Le v. United States*, 2023 WL 4708003, at *8 (N.D. Tex. July 24, 2023) (collecting Texas cases for the principle that drivers must "operate their vehicle[s] in

such a manner as to avoid foreseeable injury to others"). As Mr. Casey acknowledged, Ms. Musgrave had the right of way, and he had a duty to yield to oncoming traffic. *See* Tex. Transp. Code Ann. § 545.152 ("[t]o turn left at an intersection or into an alley or private road or driveway, an operator shall yield the right of way to a vehicle that is approaching from the opposite direction and that is in the intersection or in such proximity to the intersection as to be an immediate hazard.").

Under the circumstances of this case, Mr. Casey's failure to yield constituted a breach of his duty to exercise reasonable care in the operation of his vehicle. Mr. Casey began his left turn despite the fact that his view of oncoming traffic was obstructed by the large white truck in front of him. As Mr. Casey acknowledged, a reasonable truck driver has an obligation not to turn left if his view of oncoming traffic is obstructed. Mr. Casey's breach of this obligation on the day of the accident constituted negligence as a matter of law. Mr. Casey also admitted that, but-for the white truck, he would have been able to see Ms. Musgrave's vehicle and would not have started his turn—establishing that his negligent conduct was a cause in fact of the collision. And a collision such as the one that occurred her is a clearly foreseeable result of both failing to yield and making a lefthand turn with an obstructed view of oncoming traffic. This is all the more true given Mr. Casey was driving a large semi-truck.

The Court therefore concludes that Mr. Casey breached a duty owed to Ms. Musgrave and that this breach was a proximate cause of the ensuing crash.[6]

**D. Plaintiff's Comparative Negligence**

---

[6] Even assuming it is found liable, Defendant disputes that the crash was the proximate cause of Ms. Musgrave's ongoing symptoms. The Court addresses this aspect of causation in the section on damages.

The Court also concludes that Ms. Musgrave's negligent conduct was partially responsible for the severity of the accident.

While "there is no duty to anticipate the negligent conduct of another," a plaintiff's duty to use ordinary care to prevent injury to herself includes "a duty to keep a proper lookout." *Lopez v. City Towing Assocs., Inc.*, 754 S.W.2d 254, 263 (Tex. App.—San Antonio 1988, writ denied). "A proper lookout means that [Ms. Musgrave] must have looked in such an intelligent manner as to enable her to see what a person in exercise of ordinary care and caution for the safety of herself and others would have seen under like circumstances," and that she "must have taken such steps to guard against accidents which the conditions observed by her would necessarily indicate to be necessary." *Id.*

Here, Ms. Musgrave breached her duty to keep a proper lookout and that this breach was partially responsible for the ensuing accident and its level of severity. Assuming that Ms. Musgrave was travelling at or under 35 miles per hour and was approximately 275 feet away from Mr. Casey's truck when he began his turn, Ms. Musgrave should have been able to further reduce her speed before hitting Mr. Casey's vehicle. The Court therefore concludes that, had Ms. Musgrave kept a proper lookout, it is more likely than not that the accident would have been less severe, if not entirely avoided.

However, the Court disagrees with Defendant that Ms. Musgrave was more than 50% responsible for the accident. There is no evidence that Ms. Musgrave was distracted, speeding, or otherwise driving dangerously at the time of the accident.[7] While a reasonable driver in Ms.

[7] Defendant appears to argue that the fact that Ms. Musgrave has been in other accidents before and since the March 2022 accident constitutes evidence of her negligence in this case. But this is precisely the use of such evidence that is precluded by Federal Rule of Evidence 404(b)(1), and the Court does not consider Ms. Musgrave's previous accidents as evidence of her driving on March 2, 2022.

Musgrave's position would have either seen Mr. Casey's truck earlier or reacted to it more quickly, it remains true that Ms. Musgrave had the right of way and had no reason to anticipate that Mr. Casey would pull his large truck into oncoming traffic. A reasonable driver in Mr. Casey's position, by contrast, had every reason to know the dangers of turning left across a two-lane roadway in a commercial truck while his view of oncoming traffic was obstructed. Additionally, Mr. Casey slammed on the brakes when he saw Ms. Musgrave coming towards him, coming to a stop in the middle of the road. While this is an understandable reaction in the moment, the better course would likely have been to continue turning. Ms. Musgrave had no reason to anticipate that the USPS truck would come to a stop rather than continuing or even accelerating its turn. It is equally plausible that Mr. Casey could have avoided the accident by finishing his turn.

Under these circumstances, the Court concludes that Mr. Casey's negligence was 80% responsible for the accident, and Ms. Musgrave's was 20% responsible.

**E. Damages**

Ms. Musgrave is entitled to recover damages for the past and future medical expenses and past and future pain and suffering that she incurred as a result of this accident. However, these damages must be reduced by 20% to account for Ms. Musgrave's partial responsibility for the accident. Tex. Civ. Prac. & Rem. Code Ann. § 33.001.

The Court concludes that Ms. Musgrave is entitled to recover $63,623.23 for past medical expenses attributable to the accident, which is 80% of the $79,529.04 of past medical expenses for which Ms. Musgrave seeks compensation. Ms. Musgrave has met her burden to show that these expenses were reasonable and necessary and that she or her supplemental insurer, Aetna, actually paid or incurred medical expenses in this amount.

The Court also finds that Ms. Musgrave is entitled to recover $255,392.90 for future medical expenses attributable to the accident, including outpatient care, therapeutic services, medication, diagnostics, equipment, and supplies. This is 80% of the $319,241.13 of future medical expenses estimated in Dr. Altman's life care plan. The Court rejects Defendant's argument that these future costs are not recoverable because some of them may ultimately be paid by the United States through Medicare. Defendant has not cited any caselaw suggesting that the fact that a FTCA plaintiff is insured by the federal government through Medicare bars recovery for future medical costs, and the Court has found none. Moreover, Defendant has presented no evidence showing which of these costs (if any) are likely to be covered by Medicare. In the absence of any caselaw or evidence of offset by Defendant, the Court concludes that Ms. Musgrave is entitled to recover the full amount of her future medical costs.

The Court likewise rejects Defendant's argument that the ongoing medical and cognitive conditions for which Ms. Musgrave seeks compensation are attributable to her preexisting medical conditions, rather than the car accident. The Court disagrees. As discussed in detail its factual findings, the Court finds that the medical evidence and expert testimony in this case establishes that the accident either created or exacerbated all of the injuries and other conditions for which Ms. Musgrave seeks compensation. While it is certainly true that Ms. Musgrave's significant preexisting conditions made her more vulnerable to injury and slower to recover than a younger or healthier individual, this fact does not help Defendant's case. Indeed, "[i]t is well settled [under Texas law] that a tortfeasor takes a plaintiff as he finds [her]." *Coates v. Whittington*, 758 S.W.2d 749, 752 (Tex. 1988). This so-called "eggshell skull" rule "means that a tortfeasor may be liable for aggravation of a pre-existing physical condition of the plaintiff caused by the tortfeasor."

*Pattillo v. Franco*, No. 14-15-00628-CV, 2016 WL 4533508, at *2 (Tex. App. Aug. 30, 2016). Such is the case here with regard to Ms. Musgrave's injuries.

Finally, the Court concludes that Ms. Musgrave is entitled to recover noneconomic damages for the physical pain and mental anguish she experienced in the past and will more likely than not likely experience in the future as a result of this accident. Noneconomic damages include "physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than exemplary damages." Tex. Civ. Prac. & Rem. Code § 41.001(12). "The fact finder is granted significant discretion in determining noneconomic damages because . . . there is no objective measure to determine the adequacy of such compensation." *Holcombe v. United States*, 584 F. Supp. 3d 225, 287 (W.D. Tex 2022); *Gen'l Motors Corp. v. Grizzle*, 642 S.W.2d 837, 845 (Tex. App.—Waco 1982, writ dism'd) (non-pecuniary damages "are not susceptible of exact proof, and the amount is left largely to the sound discretion and common sense" of the finder of fact). A district court's award of damages is reviewed for clear error. *Le v. United States*, 138 F.4th 264, 278 (5th Cir. 2025).

Ms. Musgrave has experienced and continues to experience significant physical pain as a result of the accident. She was hospitalized for nine days after the accident, suffered a broken rib, broken fingers, and a fracture of her tibia, underwent multiple surgeries. Her first memory after the crash is of waking up screaming and crying in pain. In the years since the accident Ms. Musgrave has continued to experience more or less constant pain related to the accident, including leg pain, increased back pain, and more frequent migraines. The Court concludes that damages in the amount of $350,000 would fairly compensate Ms. Musgrave for past and future physical pain

and suffering associated with the accident. Ms. Musgrave is therefore entitled to recover $280,000 (80% of this amount).

The Court also concludes that Ms. Musgrave is entitled to compensation for the mental anguish and physical impairment she has and continues to experience as a result of the accident. In personal injury cases, "mental anguish may be implied from any injury which causes physical pain." *Popkowsi v. Gramza*, 671 S.W.2d 915, 919 (1984). It is therefore reasonable to assume that Ms. Musgrave suffered mental anguish as a result of her significant physical injuries.

"Physical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle." *PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 514 (2016). Here, the evidence shows that as a result of her injuries, Ms. Musgrave is no longer able to read, paint, or ambulate as she could before the accident. The Court finds that damages in the amount of $60,000 would fairly compensate Ms. Musgrave for her past and future mental anguish and physical impairment. Ms. Musgrave is therefore entitled to recover $48,000 (80% of this amount).

Because Ms. Musgrave was retired at the time of the accident, she is not entitled to damages for lost earning capacity.

## III. CONCLUSION

Based on the evidence presented, its assessment of the credibility of the witnesses and expert testimony, and its analysis of the relevant law, the Court finds that the Defendant, the United States of America, is 80% liable for the March 2, 2022 motor vehicle accident, and that the Plaintiff, Ms. Rebecca Musgrave, is 20% liable. The Court also finds that Ms. Musgrave has proved that she suffered damages in the amount of $808,770.17 as a result of the accident. Ms. Musgrave is therefore entitled to recover $647,016.14 in damages from Defendant, which represents 80% of the aforementioned amount.

**IT IS SO ORDERED**.

Signed at Houston, Texas on September 14, 2026.

Keith P. Ellison
United States District Judge